IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:21CR136 |
| vs. | |
| PRINCE L. SPELLMAN, | **FINDINGS AND RECOMMENDATION** |
| Defendant. | |

This matter is before the Court on Defendant's Motion to Suppress ([Filing No. 26](Filing No. 26)). Evidentiary hearings were held on the motion on February 3, 2022 and March 14, 2022. A transcript has been filed and the motion is ripe for disposition.

For the reasons explained below, the undersigned will recommend that the motion be denied.

**FACTS**

Omaha Police Officer Brock Rengo ("Officer Rengo") testified at the evidentiary hearing in this case. Officer Rengo works in the uniform patrol bureau, which entails responding to 911 calls and performing traffic stops. (TR. 20.) Officer Rengo also responds to ShotSpotter calls. (TR. 21.) Under the ShotSpotter system, if there is gunfire, officers are notified through dispatch or an app on their phones. (TR. 21.) The system pinpoints the location of the gunfire. (TR. 21.) Officer Rengo has been with the Omaha Police Department for approximately four years. (TR. 21.)

On March 8, 2021, Officer Rengo and his partner responded to a ShotSpotter dispatch near 2877 Fort Street, in Omaha, Nebraska. (TR. 21-22.) At the time Officer Rengo received the shots-fired call, he and his partner were near 30th and Ames Street, which is approximately a half mile away from 2877 Fort Street. (TR. 22.) Officer Rengo testified they arrived on scene within five minutes. (TR. 22.) As he was arriving in the area, Officer Rengo received an initial description of the vehicle involved in the shots-fired incident through dispatch. (TR. 22.) The vehicle was described as a silver Mercury Mountaineer. (TR. 22-23.) Officer Rengo testified that Mountaineers are older-model SUVs. (TR. 41.) Officer Rengo testified that he did not observe a silver Mountaineer before he got to Fort Street. (TR. 24.)

When he arrived at Fort Street, Officer Rengo began to drive around the area looking for vehicles. (TR. 24.) Officer Rengo testified that he met with Sergeant Kyler ("Sgt. Kyler") in his cruiser approximately one block north of Fort Street, who had also responded to the shots-fired call. (TR. 24-25.) At around that time, an update came across on dispatch which described the vehicle involved in the shots-fired incident as a Mountaineer, Jeep, or Envoy. (TR. 25.) The subject vehicle was also described as having a black top and as being two-toned. (TR. 47.) About the time Officer Rengo was meeting with Sgt. Kyler, a newer-model, grayish-silver Jeep with darker trim crossed in view of Officer Rengo's cruiser. (TR. 26-27.) Officer Rengo testified his cruiser was facing northbound on North 29th Street and the Jeep was heading westbound on Ellison Street. (TR. 26; TR. 44.) Officer Rengo stated that he observed the Jeep turn north onto 30th Street. (TR. 44.) Officer Rengo testified the Jeep caught his attention because it was a silver SUV. (TR. 26.)

Officer Rengo then made a left hand turn to get behind the Jeep. (TR. 26.) Officer Rengo stated he could not see the driver of the Jeep and did not know how many individuals were in the vehicle. (TR. 48.) Officer Rengo testified that he obtained the plate information for the Jeep and followed the Jeep for a short period of time as it went northbound on 30th Street. (TR. 27.) Officer Rengo ran the Jeep's plate number, which was WRF761, at approximately 7:08 p.m. and it came back as a 2017 Jeep Cherokee Latitude, registered to Lisa Gunter of the 2800 block of North 30th Street. (TR. 29; Ex. 104.) Officer Rengo testified that he did not feel comfortable stopping the Jeep at that point because the driving behavior was normal and because the subject vehicle had been described twice as a Mountaineer. (TR. 28-30; TR. 47.) Officer Rengo also stated that it

2

would be odd for a subject vehicle to still be in the location of the shooting soon after the incident. (TR. 44.) Officer Rengo stated that he then responded to a shots-fired call in the Miller Park/Ellison area, which was approximately a block away from where the ShotSpotter was indicated. (TR. 30; TR. 42.) Officer Rengo testified he did not find anything in that area. (TR. 30.)

Officer Rengo testified that right around that time, he received updated information from Sgt. Kyler who had received witness information regarding the shots-fired incident on Fort Street. (TR. 30-31.) Officer Rengo stated that Sgt. Kyler told him over the radio that witnesses observed a silver, newer Jeep Cherokee with a partial plate number of WRX. (TR. 31; TR. 57.) The witnesses reported they observed a black male get out of the Jeep and fire approximately five shots in the air and then drive away. (TR. 31.) Officer Rengo testified that based on this information, he believed the Jeep he observed earlier was likely the Jeep involved in the shots-fired incident. (TR. 31.) Officer Rengo explained that be believed this to be true even though the plate he observed on the Jeep was "WR*F*," not "WR*X*," because two of the letters were correct and it is not uncommon to get a plate number and it be a number off when you are trying to quickly observe a license plate. (TR. 32.)

Officer Rengo testified that he then returned to 5628 North 29th Street and met with Sgt. Kyler. (TR. 33.) Officer Rengo stated the officers had a brief conversation about the path of the Jeep compared to what the witnesses had reported and what the officers observed. (TR. 33.) Sgt. Kyler gave Officer Rengo his notepad that had the witness information on it. (TR. 33.) Officer Rengo then got a quick statement from two witnesses identified on the notepad, as well as a third individual who approached them. (TR. 34; Ex. 103.) Officer Rengo was wearing a body camera which recorded his conversation with the witnesses. (TR. 51; Ex. 103.)

The witnesses stated the subject vehicle was a silver Jeep. (Ex. 103.) The witnesses identified the vehicle specifically as a Jeep Cherokee. (TR. 35; Ex. 103.). Officer Rengo pulled up pictures of Jeeps on his phone and showed them to the witnesses who then confirmed that was the type of Jeep they saw. (Ex. 103.) The witnesses also provided a partial plate as "WRX." (Ex. 103.) Officer Rengo stated the information from the witnesses was consistent with what he had observed earlier. (TR. 35.) Officer Rengo testified that based on the information he obtained, he was satisfied that the Jeep he observed earlier was the correct vehicle involved in the incident and

that if he would have had the additional information at the time, he would have stopped the Jeep. (TR. 35.)

Omaha Police Detective Ricardo Martinez ("Detective Martinez"), who works in the criminal investigation bureau gang unit, was also on patrol the evening of March 8, 2021. (TR. 63.) Detective Martinez testified he was aware of the ShotSpotter response because he heard it over the radio. (TR. 63.) Detective Martinez was not dispatched to the call, but he was able to hear the radio traffic. (TR. 63-64.) Detective Martinez testified that he heard a uniform patrol officer say that a silver Jeep was involved in a shots-fired incident and was last seen traveling northbound on 30th Street. (TR. 65.) Detective Martinez testified that the officer on the radio read the Nebraska license plate number over the radio. (TR. 65.)

On March 9, 2021, Detective Martinez was on patrol in the area of 48th and Bedford Street in an unmarked vehicle. (TR. 66.) Detective Martinez testified that while on patrol, he observed a Jeep Cherokee matching the description of the vehicle described over the radio from the ShotSpotter call the night before. (TR. 67.) Detective Martinez stated he first saw the Jeep traveling northbound around 40th and Bedford Street. (TR. 67.) Detective Martinez stated that the Jeep had the same license plate number that had been reported from the call the night before. (TR. 67.) Detective Martinez acknowledged that the Jeep did not have a black top, but he testified the Jeep was two-toned because the bottom of the vehicle was black and the top portion was a charcoal gray color. (TR. 81-82; Ex. 1; Ex. 2.)

Detective Martinez testified that after seeing the Jeep, he conducted a U-turn and got behind the Jeep. (TR. 67-68.) Detective Martinez testified that when he got to 48th and Spaulding Street, he informed dispatch that he was behind the Jeep involved in the shots-fired call from the night before and requested marked units to assist in a traffic stop. (TR. 68.) The recording of Detective Martinez's call to dispatch shows that he called in the suspect vehicle when he was at approximately 40th and Bedford. (Ex. 106; Ex. 107.)

Detective Martinez testified that when the Jeep turned eastbound on Spaulding Street from 40th Street, he observed it commit a traffic violation by failing to signal a turn prior to 100 feet. (TR. 69.) Detective Martinez stated the Jeep did not signal until approximately ten feet before its turn. (TR. 83.) Detective Martinez testified he did not know if information regarding the traffic

4

violation was relayed to other units. (TR. 69-70.) The recording of Detective Martinez's call into dispatch reflects that the traffic violation was not mentioned. (Ex. 106; TR. 133.) The recording also reflects that the traffic violation did not occur until after Detective Martinez requested additional units to assist with a traffic stop. (Ex. 106; Ex. 107; TR. 133.) Detective Martinez testified that Defendant was booked for the traffic violation. (TR. 131.) Detective Martinez stated that other officers started arriving in the area when he was at approximately North 33rd Street and Paxton Boulevard. (TR. 68; TR. 70.) Detective Martinez testified that he believed he had reasonable suspicion to stop the Jeep and that there was no confusion in his mind about what the suspect vehicle was from the night before. (TR. 84; TR. 91.) Detective Martinez stated the information from the ShotSpotter call was fresh in his mind. (TR. 91.)

Detective Martinez testified that once the marked cruisers arrived, he started to back away to allow those officers to take primary control of the situation and conduct the traffic stop. (TR. 69.) The traffic stop occurred near 30th and Ames Street in the McDonalds parking lot. (TR. 70.) Detective Martinez testified that officers used a tire-deflating device on the Jeep and that the Jeep pulled into the McDonald's parking lot. (TR. 70-71.) Because the traffic stop was related to a shots-fired incident, officers had to conduct a felony traffic stop. (TR. 68.) This process involves taking all occupants out of the vehicle one at a time and having them walk back towards the officers' cruisers for officer safety. (TR. 69; Ex. 1.) Detective Martinez testified that more than five marked cruisers were involved in the traffic stop. (TR. 70-71.)

Detective Martinez stated that he arrived at the traffic stop as the occupants of the Jeep were being taken out. (TR. 71.) At that time, Detective Martinez observed the driver and two passengers being pulled back to the cruiser and then being placed in handcuffs. (TR. 71.) Defendant was identified as the driver of the Jeep. (TR. 132.) Detective Martinez testified that once the occupants of the Jeep had been taken back, he had contact with Jason Cooper, who had been a passenger in the Jeep. (TR. 72-73.) Detective Martinez stated Mr. Cooper had marijuana crumbs on him. (TR. 73.)

Detective Martinez testified that he was told by another officer that there was a firearm in plain view inside the Jeep. (TR. 73; TR. 135; Ex. 2.) Detective Martinez testified the firearm was located behind the driver's seat on the floorboard. (TR. 86; TR. 135; Ex. 1; Ex. 2.) Detective Martinez stated he personally viewed the firearm before it was removed from the Jeep. (TR. 73.)

5

Detective Martinez also testified the odor of marijuana was emitting from the Jeep. (TR. 73.) Detective Martinez stated that marijuana was found in the front passenger area of the Jeep and drugs were found on Defendant's person in his groin area. (TR. 75; TR. 136; TR. 138.) The firearm located in the Jeep was later determined to be the gun involved in the shots-fired incident from the night before. (TR. 75.)

Omaha Police Department Officer Andrew Woodard ("Officer Woodard"), who works as a uniform patrol officer, was on patrol on March 9, 2021, and heard the request for assistance with the traffic stop. (TR. 95-96.) Officer Woodard testified that he heard over dispatch that the subject vehicle was involved in a shots-fired incident the previous night. (TR. 97.) Officer Woodard testified that he could not recall if he was informed over the radio that Detective Martinez had observed a turn signal violation. (TR. 111-112.) Officer Woodard turned into the lead vehicle for the traffic stop because the initial lead vehicle, as well as Detective Martinez's cruiser, ran over the tire-deflating device used on Defendant's vehicle. (TR. 96.)

Officer Woodard testified that once the Jeep was stopped and the occupants were removed from the vehicle, he and another officer "cleared" the Jeep to make sure no one else was in the Jeep. (TR. 103-104.) Officer Woodard testified that because it was dark outside, he used the flashlight on his weapon to see inside the vehicle. (TR. 104.) Officer Woodward testified that when the Jeep was being cleared, another officer told him there was a handgun on the floorboard of the Jeep behind the driver's seat. (TR. 104; TR. 111; Ex. 2.) Officer Woodard stated that he also noticed a pill in the back of the Jeep. (TR. 105.) Officer Woodard testified that the rear passenger door of the Jeep was closed and the gun was seen through the tinted windows. (TR. 108; TR. 111.) Detective Martinez testified that three of the four doors on the Jeep were left open when the occupants exited the vehicle. (TR. 135.) The video of the encounter reflects that only the front and rear passenger side doors were open. (Ex. 2.) Officer Woodard testified he does not recall if there was an odor of marijuana in the Jeep. (TR. 108-109.)

## DISCUSSION

Defendant requests that the Court suppress the physical evidence seized due to the traffic stop and search of Defendant's person and vehicle on March 9, 2021. Defendant further requests

6

that all inculpatory statements Defendant made following the traffic stop be suppressed. For the reasons explained below, Defendant's Motion to Suppress will be denied.

### 1. Traffic Stop

"The Fourth Amendment permits an investigative stop of a vehicle if officers have a reasonable suspicion the vehicle or its occupants are involved in criminal activity." *United States v. Bell,* 480 F.3d 860, 863 (8th Cir. 2007). In such a case, "officer[s] may briefly stop an individual and make reasonable inquiries aimed at confirming or dispelling the suspicion." *United States v. Hughes,* 517 F.3d 1013, 1016 (8th Cir. 2008). Reasonable suspicion requires that the officers' suspicion be based upon "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime [has been] committed." *United States v. Lopez–Mendoza,* 601 F.3d 861, 865 (8th Cir. 2010) (quotation omitted). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Garcia,* 23 F.3d 1331, 1334 (8th Cir. 1994).

In justifying an investigative detention, "an officer may rely on information provided by other officers and all the information known to a team of officers involved in the investigation." *United States v. Ortiz–Monroy,* 332 F.3d 525, 529 (8th Cir. 2003). *See also United States v. Edwards*, 891 F.3d 708, 711–12 (8th Cir. 2018) ("[P]robable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication"). An officer may become a member of an investigation team when he is instructed to conduct a traffic stop even if he does not possess "all the relevant collective knowledge of the team." *United States v. Robinson,* 664 F.3d 701, 704 (8th Cir. 2011).

Having considered the matter, the Court finds there was reasonable suspicion for the traffic stop because officers had reliable information that the Jeep was involved in a shots-fired incident.[1]

---

[1] Detective Martinez testified that he observed Defendant commit a traffic violation by failing to signal a turn within 100 feet. Although traffic violations create probable cause for a traffic stop, the traffic violation observed by Detective Martinez was not the reason Defendant was stopped. *See United States v Andrews*, 454 F.3d 919, 921 (8th Cir. 2006) (stating that a "police officer may stop a vehicle when he or she has probable cause to believe that the driver has committed a traffic violation"). The evidence shows Detective Martinez called for assistance with a traffic stop before witnessing the traffic violation. In addition, the traffic violation was not relayed by Detective Martinez to dispatch.

When Officer Rengo was dispatched to the scene on March 8, 2020, he observed a silver Jeep with license plate number WRF761. Officer Rengo ran the plates through dispatch but did not feel comfortable stopping the Jeep at that point. As the investigation continued, however, witnesses advised him the subject vehicle was a silver Jeep Cherokee with a partial plate number of "WRX." Officer Rengo confirmed the make and model of the suspect vehicle with the witnesses by showing them pictures on his phone. Officer Rengo testified that once he received this additional information, he believed the Jeep he observed was the vehicle involved in the shots-fired incident. Detective Martinez, who had also been on patrol on March 8, 2020, remembered the plate number that Officer Rengo had called in over dispatch. Detective Martinez also remembered the description of the vehicle involved in the shots-fired incident. Detective Martinez testified there was no confusion in his mind about what the suspect vehicle was from the night before. Based on the information officers collectively had at the time, there was reasonable suspicion for an investigatory stop. *See United States v. Camacho*, No. 8:09CR56, 2009 WL 2421744 (D. Neb. July 21, 2009) (finding reasonable suspicion for an investigatory stop where the defendant's vehicle matched the description of a vehicle carrying a person involved in a domestic disturbance).

Although the description of the subject vehicle changed slightly as more information came through dispatch, this circumstance does not support the conclusion that officers lacked reasonable suspicion to conduct the stop. *See United States v. Molina*, 266 F. App'x 523, 527-28 (6th Cir. 2007) (holding car's color, make, and location created "a particularized basis giving rise to reasonable suspicion" even though black colored Nissan vehicles are common); *United States v. Hurst*, 228 F.3d 751, 755-57 (6th Cir. 2000) (holding that stop of the defendant's dark blue Mercury Cougar located 25 minutes' driving time from the scene of the crime was supported by reasonable suspicion even though the suspect vehicle was described as a dark-colored Thunderbird, and even though the defendant's vehicle contained a different number of occupants than the suspect vehicle). The subject vehicle was consistently described as a silver or gray SUV throughout the investigation. Further, once the witnesses were questioned, they confirmed the vehicle at issue was a silver Jeep Cherokee. This jeep was in the area where shots were fired shortly after the 911 calls. The totality of the circumstances shows there was a reasonable basis for stopping the Jeep.

### 2. Search of Vehicle

Warrantless searches, meaning searches conducted "without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quotation omitted). "In the case of a warrantless search, the government bears the burden of establishing an exception to the warrant requirement." *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). One of the exceptions to the warrant requirement is the automobile exception, which permits officers to search a vehicle "if they have probable cause to believe the vehicle contains evidence of criminal activity." *United States v. Davis*, 569 F.3d 813, 816 (8th Cir. 2009). Probable cause exists "where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005). If probable cause justifies the search of a vehicle, "it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Coleman*, 700 F.3d 329, 336 (8th Cir. 2012) (quotation omitted).

Here, the totality of the circumstances shows that there was a fair probability that contraband or evidence of a crime would be found in the Jeep. As discussed above, officers had reasonable suspicion that the Jeep was involved in a shots-fired incident. When officers approached the Jeep, they observed a firearm on the floorboard of the Jeep in plain view. Detective Martinez also testified that he smelled the odor of marijuana coming from the Jeep and observed marijuana crumbs on one of the passengers. Drugs were also found on Defendant's person. These circumstances support the conclusion that officers had probable cause to believe the Jeep contained evidence of criminal activity. *See United States v. Mayfield*, 678 F. App'x 437, 439 (8th Cir. 2017) (stating that odor of marijuana emanating from vehicle provides probable cause to conduct warrantless search of a vehicle pursuant to the automobile exception); *United States v. Davis*, 569 F.3d 813, 815 (8th Cir. 2009) (finding that probable cause existed to search vehicle during traffic stop where officer smelled the odor of marijuana emanating from the vehicle and found marijuana on the defendant's person during a pat down search conducted after the officer asked the defendant to step out of the vehicle). Therefore, the search of the Jeep was lawful.

Accordingly,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Brian Buescher that Defendant's Motion to Suppress ([Filing No. 26](#)) be denied.

Dated this 16th day of May, 2022.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

### ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.